# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Devices a-n currently located at the Drug Enforcement<br>Administration's Milwaukee District Office | )<br>)<br>)<br>)<br>)<br>) |

Case No. 25-816M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 830(b)(1)(A), 842 (a)(5),(9-11), 843(a)(3),(6-7), 841(a)(1), 843(b), 846 | Reporting and recordkeeping violations, manufacture, distribution, and possession with intent to distribute a controlled substance, use of a facility of interstate commerce to commit a drug crime, and conspiracy to do the same. |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

STEVEN KUHNMUENCH (Affiliate)
Digitally signed by STEVEN KUHNMUENCH (Affiliate)
Date: 2025.02.11 15:51:58 -06'00'

*Applicant's signature*

Steven Kuhnmuench, Task Force Officer (DEA)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: _____02/12/2025_____

*Judge's signature*

City and state: _____Milwaukee, Wisconsin_____

Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
## RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kerrianne Sundberg, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND INVESTIGATOR BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.     I am a Diversion Investigator with the Drug Enforcement Administration ("DEA"). I have been so employed since January 2019 and am currently assigned to the DEA Milwaukee District Office. As part of my duties as a DEA Diversion Investigator, I investigate criminal violations involving Title 21 of the United States Code and Title 21 of the Code of Federal Regulations, Parts 1300 et seq. In my capacity as a Diversion Investigator, I have conducted and participated in investigations of practitioners, pharmacies, organizations, and individuals involved in diversion, that is, the unlawful distribution and acquisition of pharmaceutical controlled substances and listed chemicals. I am familiar with the usual methods of investigation, including but not limited to conducting audits, the questioning of witnesses, the use of informants, undercover operations, and the review of social media platforms and phone records for communication as well as the review of electronically stored information contained on computers.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators, law enforcement officers, and witnesses, DEA records, and records and information received from other parties, such as individuals/businesses with DEA registrations to handle controlled substances and/or listed chemicals.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**<u>IDENTIFICATION OF DEVICES TO BE EXAMINED</u>**

5.      The property to be searched is the following (hereinafter the "Devices"):

a.  An Apple Mac Studio, Model No. A2615, Serial Number [S/N] QX34917NPW;

b.  an Apple MacBook Pro, Model No. A2141, S/N CO2D84SFMD6R;

c.  an Apple MacBook Pro, Model No. A2780, S/N KDOW9P9PF;

d.   Hewlett Packard (HP) Z2 Small Form Factor G5 Workstation tower, S/N MXL14320DB;

e.   a Dell Tower Computer, S/N CKB75R3;

f.   a Dell Tower Computer w/ Zebra Label-maker Attachment, S/N 8265NGW;

g.   a Dell Tower Computer, S/N 227951983;

h.   a Kanguru Thumb Drive, S/N 00109459;

i.  an Apple iPhone bearing DEA Self Sticking Evidence Envelope M000622531;

j.  an Apple iPad Pro, Model A2764, S/N C4TGJJ344Y;

k.   an Apple iPad Pro, Model A2379, S/N K3MG06KL7M;

l.   a Dell Precision Workstation, Model 7760, S/N GVTJPA00;

m.  an Apple MacBook Pro, Model A2485, S/N CH4L5C4H2G; and

n.   an Agilent Thumb Drive, S/N G333610002.

Devices a-h were seized from LESHINSKY's workplace at 1850 Pond Road, Ronkonkoma, New York, pursuant to a search warrant; Device i was seized from the person of Matthew LESHINSKY search incident to a lawful arrest; Devices j-n were seized from LESHINSKY's residence located

at 19 Tulip Avenue, Farmingville, New York, pursuant to a search warrant. The devices are currently located at the Drug Enforcement Administration's Milwaukee District Office, located at 4725 West Electric Avenue, West Milwaukee, WI 53219.

6.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.     I am conducting an investigation of SIGMA-ALDRICH, INC., a multi-national life sciences, biotechnology, and chemical company that manufactures, imports, exports, and distributes research-grade products for possible violations of 21 U.S.C. §§ 830(b)(1)(A), 842(a)(5), 842(a)(9), 842(a)(10), 842(a)(11), 843(a)(3), and 843(a)(6)-(7). The chemical products are intended primarily for laboratory research purposes. SIGMA-ALDRICH, INC. is headquartered in St. Louis, Missouri, operates under several different names, and maintains numerous DEA Registrations across the country. SIGMA-ALDRICH INC. is registered as a Chemical Distributor under DEA Registration Number 001140SDY at 6000 North Teutonia Avenue, Milwaukee, Wisconsin 53209 ("Milwaukee location"), and SIGMA-ALDRICH is registered as a Chemical Distributor under DEA Registration Number 001132SAY at 5485 County Road V, Sheboygan Falls, WI 53085 ("Sheboygan location"). These DEA registrations authorize these companies to handle and distribute List 1 chemicals.

8.     The investigation has revealed that SIGMA-ALDRICH, INC. and SIGMA-ALDRICH distributed over 3,000 kilograms of gamma-butyrolactone (GBL), a List I chemical, to Matthew LESHINSKY between September 2020 and October 2022, in addition to numerous additional listed chemicals known to be precursors for the manufacture of controlled substances, including red phosphorus and iodine.

**Legal Background**

9.     In addition to controlled substances, the Controlled Substances Act regulates listed chemicals, which are chemicals that can be used to illicitly manufacture controlled substances. Listed chemicals include controlled substance precursors, reagents, and solvents used in the manufacturing process. A List I chemical is a chemical specifically designated by DEA that, in addition to legitimate uses, is used in manufacturing a controlled substance in violation of the Controlled Substances Act, and is important to the manufacture of a controlled substance. A List II is a chemical, other than a List I chemical, designated by DEA, that, in addition to legitimate uses, is used in manufacturing a controlled substance in violation of the Controlled Substances Act. Listed chemicals, like controlled substances, are subject to certain regulatory requirements, including recordkeeping and reporting.

10.     "Every person who manufactures or distributes any controlled substance or list I chemical," or who proposes to do so, must register with DEA. 21 U.S.C. § 822(a). A DEA registration is not required to manufacture or distribute List II chemicals. DEA has issued regulations to implement the CSA's requirements related to listed chemicals. *See, e.g.*, 21 C.F.R. Parts 1309, 1310, 1313 & 1314.

11.     Section 830 imposes specific recordkeeping and reporting requirements on regulated persons for transactions involving listed chemicals, including that regulated persons must submit reports to DEA about suspicious transactions, including transactions "involving an extraordinary quantity of a listed chemical" or "an uncommon method of payment or delivery." *See* 21 U.S.C. § 830(b)(1)(A).

12.     A regulated person who engages in a regulated transaction of listed chemicals must identify the other party to the transaction. For domestic transactions, this shall be accomplished by

having the other party present documents which would verify the identity of the other party to the regulated person at the time the order is placed. The regulated person must verify the existence and apparent validity of a business entity ordering a listed chemical, verify the claimed agency status of the representative, and, for a new customer who is not an individual or cash customer, establish the identity of the authorized purchasing agent and have on file that person's signature, electronic password, or other identification. 21 U.S.C. § 842(a)(9); 21 C.F.R. § 1310.07. It is unlawful for any person who is a regulated person to engage in a regulated transaction without obtaining the identification required by 830(a)(3) of this title. *See* 21 U.S.C. § 842(a)(9).

13.    It is unlawful for any person to refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under Subchapter I or Subchapter II of the Controlled Substances Act. *See* 21 U.S.C. § 842(a)(5).

14.    It is unlawful for any person negligently to fail to keep a record or make a report under Section 830. *See* 21 U.S.C. § 842(a)(10). Pursuant to Title 21, United States Code, Section 842(a)(10) and Title 21, Code of Federal Regulations, Section 1310.05, each regulated person must report to the Special Agent in Charge of the DEA Divisional Office for the area in which the regulated person making the report is located any regulated transaction involving an extraordinary quantity of a listed chemical, an uncommon method of payment or delivery, or any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of this part.

15.    It is unlawful for any person to distribute a laboratory supply to a person who uses, or attempts to use, that laboratory supply to manufacture a controlled substance or a listed chemical, in violation of this subchapter or subchapter II, with reckless disregard for the illegal

uses to which such a **laboratory supply** will be put. 21 U.S.C. § 842(a)(11). A "laboratory supply" means a listed chemical or any chemical, substance, or item on the Special Surveillance List published by the Attorney General, which contains chemicals, products, materials, or equipment used in the manufacture of controlled substances and listed chemicals.

16.     While most violations of Section 842 are not crimes, knowing violations may be prosecuted as criminal offenses, subject to a fine and up to a year in prison. 21 U.S.C. § 842(c)(2)(A).

17.     Section 843 also provides that it is unlawful for any person knowingly or **intentionally to** possess any equipment, chemical, product, or material which may be used to manufacture a controlled   substance or listed   chemical, knowing,   intending,   or   having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical in violation of the Controlled Substances Act, and to **manufacture**, **distribute**, export, or import   any   equipment,   chemical,   product,   or   material   which   may   be   used to **manufacture** a **controlled** substance or **listed** chemical, knowing,   intending,   or   having reasonable cause to believe, that it will be used to **manufacture** a **controlled substance** or **listed chemical** in violation of the Controlled Substances Act. 21 U.S.C. § 843(a)(6)-(7).

18.     Gamma-butyrolactone (GBL) is a List I chemical, which is illicitly used as a substitute and chemical precursor to gamma-hydroxybutyric acid (GHB), a Schedule I controlled substance. GBL is used in cleaning solutions, paint removers, cleaners, adhesives and nail polish removers, among other uses. In the body, GBL is converted to gamma-hydroxybutyrate (GHB) by the human body after oral administration, and has similar pharmacological effects to GHB, better known as a date-rape drug abused for its euphoric and sedative effects. If intended for human

consumption, GBL may be treated as a "controlled substance analogue" under the Federal Analogue Act, 21 U.S.C. § 813.

**Background on New York Investigation**

19.     In April 2024, the Drug Enforcement Administration's Milwaukee District Office received information that SIGMA-ALDRICH, INC. allegedly sold chemical products to Matthew LESHINSKY (DOB: 09/21/1999).

**Response and Warrant at 1850 Pond Road, Ronkonkoma, New York – June 7, 2023**

20.     On June 7, 2023 at approximately 3:34 a.m., the Suffolk County Police Department was dispatched to a 911 call for a possible burglary in progress at Quantitative Labs, located at 1850 Pond Road, Ronkonkoma, NY. The responding officer spoke with the caller Matthew LESHINSKY, who said that two men broke into the building through the front glass door while he was working. (At the time, LESHINSKY was on probation, as he had been convicted and sentenced to 3 years probation on July 7, 2021 for endangering the welfare of a child, pursuant to New York State Penal Law 260.10.)

21.     LESHINSKY said that he had the incident on video, which he showed the officer on his Apple iPhone. LESHINSKY believed the burglars were still in the building. When asked what type of laboratory this was, LESHINSKY stated: "we do testing for the state." Officers entered the building, but did not find any other individuals. However, officers noticed a strong chemical odor, and observed a laboratory equipment, plastic 55-gallon drums, bottles of different chemicals, including Acetone and Naphtha, drug paraphernalia, a bong, and a hypodermic needle strewn about.

22.     Officers noticed evidence of an attempt to breach a locked interior office that contained a safe, and found what appeared to be burglars' tools in or around the area of this breach

attempt. Inside the locked office, police found two blue 55-gallon plastic drums. LESHINSKY opened the locked office by placing his fingerprint on the lock. Police noted a strong chemical odor throughout the interior of the building. Police also observed surveillance equipment, including recording devices and several monitors displaying different camera angles in and around the building. Police also observed a crystal-like substance on the desk and floor, which appeared, based on officers' training and experience, to be methamphetamine.

23.      In an adjoining room, police officers also observed various chemical containers, including large glass bottles of acetone, naphtha, baking soda, and other chemical solvents, which are commonly used in the manufacture of methamphetamine. Officers also observed various laboratory equipment, including beakers, syringes, a water pipe, and a handheld torch. Inside of a warehouse, officers observed numerous large unlabeled blue plastic drums, chemical containers, and a chemical apparatus. Officers believed that LESHINSKY was manufacturing, packaging, and distributing controlled substances, including methamphetamine, on the premises. During a subsequent search, law enforcement officers recovered 91 grams of solid methamphetamine, liquid methamphetamine, and a substance containing cocaine inside of a safe with approximately $40,000. Officers also found numerous glass bottles containing dimethyltryptamine ("DMT") and numerous blue 55-gallon drums containing gamma-butyrolactone ("GBL"). Law enforcement also recovered laboratory equipment, chemical reagents, and solvents used in the manufacture, preparation, or production of methamphetamine and other illicit synthetic drugs, including DMT and ketamine.

24.      LESHINKSKY was arrested and charged by a Grand Jury in New York various controlled substance offenses under state law. LESHINSKY later pled guilty in February 2024 to nine felonies in New York State, including six counts of criminal possession of a controlled

substance, two counts of unlawful manufacture of methamphetamine, and one count of unlawful disposal of methamphetamine laboratory material.

25.     As a result of that search warrant law enforcement seized the electronic items referenced herein from the location of 1850 Pond Road, Ronkonkoma, New York. Devices a-h were recovered from the laboratory. That search warrant is attached here as Exhibit A and incorporated by reference.

26.     A gray Apple iPhone in a blue case—Device i—was recovered from LESHINSKY's person.

**Warrant at 19 Tulip Avenue, Farmingville, New York – June 8, 2023**

27.     As a result of the response and warrant at the laboratory, law enforcement obtained a warrant to search LESHINSKY's residence at 19 Tulip Avenue, Farmingville, Suffolk County, New York. The Suffolk County Police Department recovered six items—desktop and laptop computers, iPads and a thumb drive—Devices j-n.  That search warrant is attached here as Exhibit B and incorporated by reference.

28.     While on scene, law enforcement officers observed a receipt from Chase Bank indicating a withdrawal of $101,000 in U.S. currency in plain view inside of LESHINSKY's Audi RS5 vehicle.

**Interview of Matthew Leshinsky**

29.     On January 23, 2024, LESHINSKY was interviewed by the Drug Enforcement Administration's Long Island District Office, the Suffolk County Police Department, and the Suffolk County District Attorney's Office. During that interview, LESHINSKY admitted to purchasing List I chemicals from SIGMA-ALDRICH, INC. and selling some of those chemicals to his friends for profit. LESHINSKY said that he never intended to use the List I chemicals for

any legitimate purpose. LESHINSKY stated that he was the sole owner of MEL Restoration & Development, with an address located at 1850 Pond Road, Suite B, Ronkonkoma, New York. LESHINSKY stated that he was addicted to crystal methamphetamine and ketamine. LESHINSKY denied manufacturing crystal methamphetamine, but admitted to having the knowledge and precursor chemicals to do so. LESHINSKY said that he had purchased GHB from low-level street dealers and would use GHB on occasion. LESHINSKY stated that he was aware that GBL, when ingested provides the same effect as GHB so he researched how he could legally obtain it. LESHINSKY admitted that he started selling GBL to fuel his drug addiction and fund the legitimate parts of his business. LESHINSKY stated that he began ordering GBL from SIGMA-ALDRICH, INC. in Pennsylvania, and started ordering 10 to 25 ounces to sell for profit to his friends. LESHINSKY admitted that he never intended to use the GBL for any legitimate purpose. LESHINSKY stated that he was making a lot of money and began purchasing larger quantities of GBL from SIGMA-ALDRICH, INC. ultimately draining them of their inventory. LESHINSKY began researching other chemical distributors around the United States to keep up with demand and identified Chem-Universe, a company located at 2057 Plainfield Drive, Des Plaines, Illinois 60018, that had a large amount of GBL in stock. LESHINSKY said that he sold GBL to Christian BURGBACHER (DOB: 08/07/1995); Stanley ALLWAY (DOB: 02/29/1966), and MICHAEL ESTRADA (DOB: unknown), and Thomas CAMARTA or Thomas GAMBINO.

**Overview of Sigma-Aldrich, Inc.'s Involvement**

30.     On April 17, 2024, Diversion Investigator Kerrianne Sundberg and Diversion Investigator William Robson conducted an inspection of SIGMA-ALDRICH, INC. located at 6000 North Teutonia Avenue, Milwaukee, Wisconsin 53209 and requested all records related to LESHINKSY and his companies MEL RESTORATION & DEVELOPMENT and

QUANTITATIVE LABORATORIES, with an address of 1850 Pond Road, Suite B, Ronkonkoma, New York.

31.     SIGMA-ALDRICH, INC. provided sales transaction invoices, authorized purchaser forms, usage forms, and email communications between SIGMA-ALDRICH's employees and LESHINSKY. SIGMA-ALDRICH, INC. also provided a copy of their customer screening procedures. The authorized purchaser forms identified Nikki VINOKUR, Christian BURGBACHER, and Matthew LESHINSKY as authorized contact persons for MEL RESTORATION & DEVELOPMENT.

32.     SIGMA-ALDRICH, INC.'s Customer Screening Procedures, which are used to identify high-risk customers, contain a list of potential red flags, which includes in relevant part: unexplained rapid ramp-up of orders; unusual volume of orders for the type or size of company; odd product mix for the business; repetitive products; delivery to a P.O. Box, Freight Forwarder, or Residential Address.

33.     SIGMA-ALDRICH, INC. received a Customer Application signed by LESHINSKY on September 14, 2019 for MEL RESTORATION & DEVELOPMENT, which provided a company website of www.mel-restoration.info and a delivery address of 94 Gardiners Avenue, Suite 395, Levittown, NY 11756. LESHINSKY was listed as the primary business contact, and listed his university email address mleshinsky@pride.hofstra.edu. (I would note that "MEL" is consistent with the initials of Matthew Edward Leshinsky's name.) The primary business activity checked off as "Consultant, Cosmetics, Food & Flavors and Fragrances, Laboratory R&D." In that customer application, LESHINSKY listed the following as the explanation of how MEL Restoration & Development would use SIGMA-ALDRICH, INC.'s products:

Our company originally started as a restoration business where we would restore antiques using product specific solvents, thinners, acids, and other restoration type reagents to strip the antique of its old finish, and then carefully paint and "restore" it back to its originally beat. Since then, myself and my fellow colleagues decided to branch off into the research and development of both personal hygienic/cosmetic compounds as well as flavors and naturals/synthetic fragrances. We use a wide variety of reagents, as we enjoy and typically create our end products in house. This is largely due to budget constraints but nonetheless, the products we would be procuring would be included but not limited to the following: various aromatic reagents, synthetic reagents, oxidizing and reducing agents, intermediately reagents, safety equipment, glassware, terpenes (both cyclic and linear), variety of alcohols & carboxylic acids, and sparingly some aldehydes and ketones. I personally preform a lot of organometallic chemistry to create these natural compounds from Grignard/organometaalic reagents. Following the creation of a flavor/fragrance it is then analyzed using our Agilent GC-FID/ECD and then subsequently a Bruker TX GC-MS/MS. We then upload all information regarding synthesis, compounds, and properties to our library database, and either compare it to our known natural standards, or do so in the future.

34.     As part of its due diligence, SIGMA-ALDRICH, INC. obtained a Business Certificate, which was submitted on December 19, 2019 to the Nassau County Clerk's Office in the State of New York, which listed MEL Restoration & Development's address as Gardiners Avenue, Suite 395, Levittown, New YY 11756, and Leshinsky's name as "Matthew Edward Leshinsky." SIGMA-ALDRICH, INC. also obtained a copy of the employer identification number (EIN) letter issued by the U.S. Department of Treasury's Internal Revenue Service, indicating that Matthew E Leshinsky and/or MEL Restoration & Development was sent a notice on December 6, 2019. Both of these documents were generated after LESHINSKY's customer application and suggested that MEL Restoration & Development was recently formed or incorporated.

35.     On an undated First Time Buyer Report submitted to SIGMA-ALDRICH, INC. for 500ML of Safrole, a List I chemical, which is a compound used in the illicit manufacture of 3,4-methylenedioxymethamphetamine (MDMA), a Schedule I controlled substance commonly referred to as "Molly" or "Ecstasy." LESHINSKY listed that the product use was: "For strict R&D

purposes to discover the connection between molecular form and function in the human olfactory system," with a facility description that stated: "We not only do R&D on fragrance and flavors, but also remediation for local land fills. Our aim is to reduce their carbon footprint so that our young interns will too follow the green chemistry principles." On a note dated August 10, 2020, a SIGMA-ALDRICH, INC. employee indicated that the address listed, referring to MEL Restoration's address on the First-Time Buyer report, was a shipping center and requested the lab address. LESHINSKY responded as follows: "We are in the building behind the UPS store, Islip Recovery Agency is part of our restoration projects. I also have placed orders with EMD millipore which I have already gone through screening and received orders. I hope this will expedite the process. For reference, one order placed directly from Millipore was order # 3202179368 customer: 30040302." SIGMA-ALDRICH, INC.'s notes indicate that a SIGMA-ALDRICH, INC. employee viewed a map showing the back of the UPS store and looked at a Dun & Bradstreet listing for LESHINSKY—https://www.dnb.com/business-directory/companyprofiles.matthew_edward_leshinsky.

36.     SIGMA-ALDRICH, INC. received a "DEA List I and II Chemicals - Authorized Purchaser Form" dated August 22, 2020 for "B103608-2.5K GAMMA-BUTYROLACTONE, REAGENTPLUS," listing LESHINSKY as the authorized purchaser and "Nikki Vinokur" with a job title of "Regulatory Affairs" as the authorized contact person. That Authorized Purchaser Form includes the purported signature of LESHINSKY and the purported signature of Nikki VINOKUR, along with email addresses of matthew.leshinsky@mel-development.info and nikki.vinokur@mel-development.info. The Authorized Purchaser Form indicates that an email

would be sent by MILLIPORE SIGMA to the Contact Person, in this case VINOKUR, before this item can be shipped to verify their authorization of the purchaser/ordering party."

37.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 5 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" (GBL) from their Allentown, PA location to MEL Restoration & Development on or about September 21, 2020.

38.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 500 grams of "METHYLAMINE HYDROCHLORIDE, >=98%," a List I chemical which is used in the illicit manufacture of methamphetamine, from their Milwaukee location to MEL Restoration & Development on or about October 26, 2020.

39.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 2.5 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" (GBL) from their Allentown, PA location to MEL Restoration & Development on or about July 7, 2021.

40.     On August 25, 2021, LESHINSKY emailed "Justin," a Product Screening employee at SIGMA-ALDRICH, INC., stating: "Hi again Justin, As during our previous research we have found a synthetic method to create a poly-4-hydroxybutyrate polymer. This reagent will allow us to push forward in testing the polymer. We chose to go with the FCC grade product this time after speaking with Sigma technical support to clarify that it would react in the same manner as its Reagentplus counterpart. We were told yes and this item was much more cost effective for our team."

41.     SIGMA-ALDRICH, INC. received a "DEA List I and II Chemicals - Authorized Purchaser Form" dated August 26, 2021 listing LESHINSKY as the authorized purchaser and "Christian Burgbacher" with a title of "Regulatory Affairs" as the authorized signature. This

Authorized Purchaser Form contained the purported signature of LESHINSKY, along with email address matthew.leshinsky@mel-development.info, and the purported signature of Christian BURGBACHER, with email address c.burgbacher@mel-development.info. The Authorized Purchaser Form indicates that an email would be sent to the Contact Person to verify their authorization of the purchaser/ordering party before the item can be shipped.

42.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 25 kilograms of "4-HYDROXYBUTANOIC ACID LACTONE =98%, FCC" from their Sheboygan location to MEL Restoration & Development on or about August 27, 2021. Gamma-butyrolactone (GBL) is also known as 4-hydroxybutanoic acid lactone.

43.     On September 14, 2021, LESHINSKY emailed "Justin," a Product Screening employee at SIGMA-ALDRICH, INC., stating: "Hi Justin, We're scaling up our process to conduct further testing on our biorenewable bioplastic polymer using the catalyst Tris(N,N-bis(trimethylsilyl)amide]lanthanum(III)."

44.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 100 kilograms of "4-HYDROXYBUTANOIC ACID LACTONE =98%, FCC" from their Sheboygan location to MEL Restoration & Development on or about September 14, 2021.

45.     On October 1, 2021, LESHINSKY emailed "Justin," a Product Screening employee at SIGMA-ALDRICH, INC., stating: "Hi Justin, We're proceeding with our research on poly4B

as a bio renewable polymer, increasing capacity, as well as beginning a new project on the development of perovskite solar cell's."

46.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 25 kilograms of "4-HYDROXYBUTANOIC ACID LACTONE =98%, FCC" from their Sheboygan location to MEL Restoration & Development on or about October 7, 2021.

47.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 25 kilograms of "4-HYDROXYBUTANOIC ACID LACTONE =98%, FCC" from their Sheboygan location to MEL Restoration & Development on or about October 19, 2021.

48.     On November 5, 2021, LESHINSKY emailed "Regina," a Product Screening employee at SIGMA-ALDRICH, INC., stating: ""Hi Regina! As our business is expanding, we have developed our poly4B polymer and are looking into perovskite cell generation. We have been producing the bio renewable polymer and testing it's capabilities and limits for roughly 3 months now, and have stemmed into perovskite cell development as well."

49.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 500 kilograms of "4-HYDROXYBUTANOIC ACID LACTONE =98%, FCC" from their Sheboygan location to MEL Restoration & Development on or about November 12, 2021.

50.     SIGMA-ALDRICH, INC. received a Usage Form signed by LESHINSKY dated December 7, 2021 for "B103608-Conf Gamma-Butyrolactone, Reagentplus, >=99%," which refers to GBL. The use was listed as "Research/Analysis," and provided the following statement of usage: "We intend to use the reagent to synthesize the bio renewable ploymer Poly4B and further investigate its various characteristics such as recyclability, elasticity, and the point at which

ring opening polymerization occurs and how we can optimize each of these characteristics of the polymer."

51.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 300 kilograms of "4-Hydroxybutanoic acid lactone =98%, FCC," from Sheboygan to MEL Restoration & Development on or about December 10, 2021.

52.     On December 27, 2021, LESHINSKY emailed "Regina," a Product Screening employee at SIGMA-ALDRICH, INC., stating: "Hi Regina, Our intended usage is for creation and testing of a bio-renewable polymer and to secure stock for 2022."

53.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 1,000 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" from their Milwaukee location to MEL Restoration & Development on or about January 6, 2022.

54.     On February 25, 2022, "Amy," a Product Screening employee at SIGMA-ALDRICH, INC., emailed LESHINSKY stating: "This is a lot of DEA regulated material, how long will this last you?" LESHINSKY responded the same date by email stating: "Hi Amy, Thank you so much for reaching out. Our last order we placed on December 10th of 2021 #3028420214 and we are beginning to run out of material so that's roughly 3 months, this purchase is a proactive measure to secure material so I predict it should last us the next 3-4 months."

55.     SIGMA-ALDRICH, INC. received a Usage Form signed by LESHINSKY dated February 26, 2022 for "B103608-Conf Gamma-Butyrolactone, Reagentplus, >=99%," which refers to GBL. The use was listed as "Research/Analysis," and provided the following statement of usage: "We intend to use the reagent to synthesize the bio renewable polymer Poly4B and further investigate its various characteristics such as recyclability, elasticity, and the point at which

ring opening polymerization occurs. We are also investigating different catalytic processes that will create cyclic polymerization of this lactone species at different temperatures."

56.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 904 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" from their Milwaukee location to MEL Restoration & Development on or about March 11, 2022.

57.     On April 25, 2022, "Megan," a Product Screening employee at SIGMA-ALDRICH, INC., emailed LESHINKSY asking for the intended use for Y-butryolactone. LESHINSKY responded that same day by email stating: "Good afternoon Megan, We are securing this new product sku for our research and development of a biorenewable polymer (poly4B) and as advised by Charles Goranitis, due to the massive amount of supply chain issues with other SKU's, securing the product sooner than later such that we can continue forward with our research for the coming future. Thanks!"

58.     On April 26, 2022, "Amy," a Product Screening employee at SIGMA-ALDRICH, INC., emailed LESHINSKY asking: "Are you using this as part of your cleaning process?" LESHINSKY responded that same day by email stating:

> Hi Amy, I apologize if the name of my company gave you the wrong impression, we are developing a biorenewable polymer and researching ways of restoring the environment via bio-sourced energy. With this item it is a bio-based polymer. We are ordering this quantity due to the supply chain issues and the fact it's a new sku from Sigma. Feel free to reach out to Charles if you have any questions relating the manner, as he has been with us from the start and has been an invaluable resource from MilliporeSigma. Thank you!

59.     On April 26, 2022, "Nick," a Product Screening employee at SIGMA-ALDRICH, INC., emailed LESHINSKY asking: "Hello, Thank you for the information. Will the entire quantity of this order be used at 1850 POND RD, RONKONKOMA, NY 11779? Will it be stored at this address? Please estimate how long this supply should last." LESHINSKY responded that

same day by email stating: "Hi Nick, Yes it will be stored solely in my facility for our work, and it should last me two quarters fiscally. I'm placing the order now due to supply chain issues with similar sku's. Please reach out to Charles Goranitis for any other information with respect to quantity and timing of purchase. Thank you!"

60.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 140 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" from their Milwaukee location to MEL Restoration & Development on or about May 5, 2022.

61.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 20 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" from their Milwaukee location to MEL Restoration & Development on or about May 20, 2022.

62.     On July 14, 2022, Charles GORANITIS, an Account Development Specialist of SIGMA-ALDRICH, INC., sent an email to Justin, a Product Screening employee for SIGMA-ALDRICH, INC., which stated the following:

> Hi Justin, To follow up on our phone conversation, I have worked closely with Matthew Leshinsky from MEL Restoration since 2021. He purchased this GBL because his testing showed that it can break down polymers into smaller molecules. His usage is not drug related at all, even though it is a DEA regulated product. According to him, this product does a great job of breaking down polymers into smaller molecules; so much so that his private investors are funding him and pushing him to obtain a patent for the discovery. I have facetimed this customer multiple times and have seen the inside of his new Lab at 1850 Pond Rd. Below is a photo of the Lab space while it was in the process of being put together. It is not huge, but it is indeed a Lab. He just had an HPLC installed yesterday; he even

bought a Labwater purification system from us. I do not see any red flags from this customer of his statements. I understand it is a small location and a lot of material. Nonetheless, I believe this customer is truthful with their application. I've developed a close relationship with him since their account started growing last year and see him as truthful.

63.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 225 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" from their Milwaukee location to MEL Restoration & Development on or about July 19, 2022.

64.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 40 kilograms of "GAMMA-BUTYROLACTONE, REAGENTPLUS, >=99%" from their Milwaukee location to MEL Restoration & Development on or about October 10, 2022.

65.     On October 31, 2022, LESHINSKY emailed SIGMA-ALDRICH, INC.'s Product Screening, stating: "Will be used as a CRM/analytical reference for standard comparison in our research study."

66.     SIGMA-ALDRICH, INC. received an Authorized Purchaser Form for "90970-1ML GAMMA-BUTYROLACTONE" dated November 6, 2022 listing LESHINSKY as the authorized purchaser and the authorized signature of the contact person, with LESHINSKY's purported signature and email address matthew.leshinsky@mel-development.info.

67.     According to SIGMA-ALDRICH, INC.'s sales records, SIGMA-ALDRICH, INC. shipped 800ML of "METHYLAMINE, 2.0M SOLUTION IN METHANOL" from their Milwaukee location to MEL Restoration & Development on or about March 7, 2023.

68.     On June 13, 2023, Justin KOMOS, a Product Screening Team Lead at SIGMA-ALDRICH, INC., sent an  email requesting that SIGMA-ALDRICH, INC. shut down LESHINSKY's account, as KOMOS had received information from GORANITIS that LESHINSKY had been arrested.

69.     A review of records provided by FedEx for shipments to 1850 Pond Road, Unit B, Ronkonkoma, NY 11779 and 94 Gardiners Avenue, Suite 395, Levittown, NY 11756 showed that between March 28, 2022 and May 17, 2023, SIGMA-ALDRICH, INC.'s location at 6000 North Teutonia Avenue, Milwaukee, WI sent 35 shipments to MEL Restoration & Development—and the majority were sent to 94 Gardiners Avenue, Levittown, NY 11756—a UPS store. Only 3 shipments from SIGMA-ALDRICH, INC. located at 6000 North Teutonia Avenue, Milwaukee, WI were sent to the laboratory at 1850 Pond Road, Ronkonkoma, NY 11779. MEL Restoration & Development also received 35 shipments from SIGMA-ALDRICH, INC.'s location at 6950 Ambassador Drive, Allentown, PA 18106, another Chemical Distribution under DEA Registration Number 001179SAY. MEL Restoration & Development also received 30 shipments from SIGMA-ALDRICH, INC.'s location at 2425 South Second Street, St. Louis, MO 63104.

**Interview of Matthew Leshinsky – December 4, 2024**

70.     On December 4, 2024, DEA Diversion Investigator Kerrianne Sundberg and DEA Task Force Officer Steven Kuhnmuench interviewed Matthew LESHINSKY. LESHINSKY told investigators he was interested in chemistry from a very young age and studied chemistry in college. He was most interested in and very successful in organic chemistry courses which he described as "what the making of drugs was all about." Around the time of the COVID-19 pandemic, LESHINSKY began heavily using methamphetamine after a shortage of his medication for attention-deficit-hyperactivity-disorder.

71.     LESHINSKY originally created a home laboratory at his parent's house. Around 2019, LESHINSKY stated he was high on methamphetamine and while wearing a tyvex suit and holding a syringe of mustard gas, LESHINSKY threatened to spray his father with the mustard gas if he went near LESHINSKY. The police were called and large amounts of chemicals were located

in crates on the side of the house, which were ultimately removed by an environmental waste company. LESHINSKY received a misdemeanor charge and was placed on probation. LESHINSKY stated at that time he had been ordering and gathering precursor chemicals to make MDMA. LESHINSKY went to a rehabilitation facility shortly after this encounter with the police.

72.     While in the rehabilitation facility, LESHINSKY decided he wanted to build another laboratory. He created a sole proprietorship, "MEL RESTORATION," which he advertised as an antique restoration business. Later, LESHINSKY thought if he added "and development" to the name, "MEL RESTORATION AND DEVELOPMENT", he would be able to order any chemicals he wanted. LESHINSKY portrayed the business as creating poly-renewable polymers and bio-renewable plastics. He obtained a mailbox at a local UPS store because chemical companies would not deliver to residential addresses. LESHINSKY informed the chemical companies which he ordered from that his business was next to the UPS store and they shared the back loading dock, although that was not true. LESHINSKY updated 'Google Maps' to show his business existed at the UPS store. He obtained a DUNNS business profile and EIN number and created a website for MEL RESTORATION AND DEVELOPMENT.

73.     In relevant part, LESHINSKY stated that he read the DEA Chemical Handlers Manual online and learned how to order listed chemicals to appear as if he was running a legitimate business. LESHINSKY had a big interest in flavor and fragrance creation because a lot of precursor chemicals he wanted were also flavors, and shared the example that benzaldehyde resembled the scent of maraschino cherries. LESHINSKY discovered if he told chemical companies he was making flavors and fragrances that he could order List I chemicals. In addition, he discovered if he said he was making a perovskite solar cell it gave him a good reason to order large amounts of

chemicals, although LESHINSKY's lab did not actually have the capability to make perovskite solar cells in large quantities.

74.     LESHINSKY first began ordering chemicals from a small chemical company, "Thomas Scientific," that he described as a "mom and pop" company. He said he attempted to order chemicals from another company, Beantown, who refused to deliver the chemicals to the UPS Store. Beantown subsequently notified Thomas Scientific that LESHINSKY's address was a UPS Store and, as a result, Thomas Scientific stopped doing business with LESHINSKY.

75.     LESHINSKY stated he always loved SIGMA-ALDRICH, INC.'s mission statement and always wanted to do business with them. LESHINSKY completed an application to become a customer of SIGMA-ALDRICH, INC. and provided information that his business operated out of a local UPS store, which was not true. SIGMA-ALDRICH, INC. delivered the listed chemicals LESHINSKY ordered to the UPS store on numerous occasions, and LESHINSKY waited for the deliveries at the loading dock to make it appear he operated out of that location. SIGMA-ALDRICH, INC. questioned why they could not see MEL RESTORATION AND DEVELOPMENT on Google Maps and LESHINSKY informed them it had not been updated yet. LESHINSKY updated Google Maps himself to show the business location.

76.     LESHINSKY was required to fill out Usage Forms for chemical orders approximately every six months. On the forms, LESHINSKY listed representatives of his firm as people he knew (without their knowledge) and also made up other employee names. He stated he wrote pretty much the same reason for chemical use on each usage form. The first chemical LESHINSKY ordered from SIGMA-ALDRICH, INC. was safrole, which he used to make MDMA.

77.     LESHINSKY discovered GBL on the internet and said methamphetamine and GBL went hand-in-hand. He heard about GBL before and knew it was used at "sex parties" and by the "meth community." Drug dealers and users preferred GBL over GHB because it was a much harsher chemical. When LESHINSKY began ordering GBL he informed SIGMA-ALDRICH, INC. he was conducting perovskite solar cell research and that he discovered bio-renewable polymers. However, LESHINSKY's lab did not have the capabilities to actually conduct the activity in large quantities. There were two different types of GBL that could be ordered from SIGMA-ALDRICH, INC—an analytical grade and a food grade. The food grade was much cheaper to purchase and had the same effects when used for human consumption. LESHINSKY stated "everyone loved it." LESHINSKY discovered he could make "ridiculous" amounts of money off the GBL. LESHINSKY started ordering GBL in small quantities of a couple liters which were shipped to the UPS Store. While he was in the rehabilitation facility, a friend picked the chemicals up from the UPS Store. LESHINSKY began increasing the quantity of GBL he ordered to over 100kg per order, which was delivered to the UPS Store in 25kg plastic jugs. LESHINSKY separated the GBL into one-gallon containers and sold it on the street. One individual dosage unit, for human consumption, was approximately 1ml.

78.     In 2021, LESHINSKY opened the laboratory on Pond Road in New York. It was approximately 3,300 square feet, which included approximately 1,500 square feet of warehouse space. LESHINSKY stated the lab made everything easier. He conducted a "good amount" of cannabis testing there, which was the only legitimate part of his business. None of the listed chemicals he ordered were used for cannabis testing. The GBL made him so much money and he was doing so well financially that he dropped out of college. With having the lab, LESHINSKY was able to increase the quantity of his GBL orders, which were delivered to the lab in barrels and

dropped off on pallets. He wasn't able to order this quantity to the UPS Store as they were too heavy and large to be moved by a person.

79.     LESHINSKY met the people he sold the GBL to in the "meth community." LESHINSKY paid approximately $78.00 for one liter of GBL and sold it for $800.00. When he increased his orders, he paid approximately $2,000.00 per barrel and sold the contents for approximately $70,000.00. LESHINSKY drained SIGMA-ALDRICH of their GBL supply but continued to order other chemicals from them until his arrest. After LESHINSKY drained SIGMA-ALDRICH, INC. of their GBL supply he started ordering GBL from a chemical company in Illinois.

80.     The sales representative LESHINSKY worked with at SIGMA-ALDRICH, INC. was Charles GORANITIS. LESHINSKY said that he often spoke with GORANITIS by phone a few times per month and regularly conducted FaceTime calls with GORANITIS. LESHINSKY stated the calls lasted up to an hour and included both work-related and personal conversations. LESHINSKY stated he and GORANITIS became "friends," but not "good friends." LESHINSKY and GORANITIS never met in person. LESHINSKY stated GORANITIS did not understand science, so it was not difficult to convince GORANITIS the chemical orders were legitimate. GORANITIS vouched for LESHINSKY to SIGMA-ALDRICH, INC. when LESHINKSY placed large chemical orders.  LESHINSKY stated that GORANITIS did not know what LESHINSKY was really doing with the chemicals at his lab and GORANITIS did not receive any monetary gain from LESHINSKY. LESHINSKY stated GORANITIS was a leader in sales at SIGMA-ALDRICH, INC and he helped LESHINSKY get better deals on products he ordered.

81.     GORANITIS placed all the chemical orders for LESHINSKY. LESHINSKY believed all chemical orders he placed automatically went to SIGMA-ALDRICH, INC.'s Product

Screening Department. SIGMA-ALDRICH, INC. questioned the quantity of GBL ordered by LESHINSKY on several occasions; however, each time they made the sale to LESHINSKY. LESHINSKY did not recall SIGMA-ALDRICH, INC. ever refusing to fill an order he placed. In fact, LESHINSKY recalled on one occasion an order SIGMA-ALRICH, INC. placed on hold as suspicious, from another company, was rerouted to fill one of LESHINSKY's orders. LESHINSKY stated that SIGMA-ALDRICH, INC. did not know that LESHINSKY was using the chemicals illegally. LESHINSKY stated it was easy for him to get chemicals from SIGMA-ALDRICH, INC. because of his knowledge and background. LESHINSKY did not use the listed chemicals for legitimate purposes and, in fact, made so much profit from the illicit sales of GBL that he was able to open his own laboratory and drop out of college. In addition, LESHINSKY made MDMA and quaaludes at his lab. LESHINSKY stated the following chemicals he ordered from SIGMA-ALDRICH, INC. were used as follows: Benzyl Cyanide - used to make amphetamines; GBL - small amount used for bio-renewable polymer, rest sold illicitly; Hydroxybutanoic Acid - sold illicitly; Red Phosphorus - never used, remained sealed; Methylamine - used to make MDMA; Iodine - never used, remained sealed; Anthranilic Acid - used to make quaaludes; Safrole - used to make MDMA; Hydriotic Acid - never used, remained sealed; Benzaldehyde - used to make amphetamines. LESHINSKY stated if it wasn't for SIGMA-ALDRICH, INC. none of this would have been possible. LESHINSKY stated if he wasn't so high on methamphetamine he believed he would never have gotten caught.

82.     A review of DEA databases revealed that SIGMA-ALDRICH, INC. did not report any suspicious orders placed by LESHINSKY. A query of DEA databases was conducted for variations of business names associated with SIGMA-ALDRICH, INC., including Sigma, EMD Millipore and Millipore Sigma. The query revealed Sigma Aldrich Company, located in St. Louis,

Missouri, received a Letter of Admonition from DEA in 2012 for failure to identify the other party in a regulated transaction, failure to verify the existence and apparent validity of a business entity ordering a listed chemical, failure to verify the claimed agency status of the representative of a firm and failure to provide effective controls to guard against the diversion of list I chemicals. The Sigma location that shipped the listed chemicals was located in Milwaukee, Wisconsin. The query also revealed a Sigma company sold list I and precursor chemicals to a business, located in Oregon, who was an individual operating a clandestine laboratory used to manufacture controlled substances.

83. DEA's Drug and Chemical Evaluation Section provided information that 3,511.5kg of GBL (assuming 100% purity and based on a dosage unit of 2.25g), could make approximately 1,560,667 individual dosage units. LESHINSKY purchased approximately 3,511.5kg of GBL from SIGMA-ALDRICH, INC.

84. Individuals involved in the manufacture, preparation, production, and distribution of illicit controlled substances often use electronic devices, including desktops, laptops, tablets, and storage devices as instrumentalities of their crimes. Here, LESHINSKY was in possession of several computers, tablets, and electronic storage devices while operating a clandestine laboratory involved in the illicit manufacture, preparation or production of methamphetamine and other illicit synthetic drugs. These devices appeared to be operational, and, in fact, some were connected to high-end laboratory instruments, such as a gas chromatography mass spectrometer.

85. In my experience and training, books and records are maintained by individuals involved in the manufacture, preparation or production of methamphetamine and other illicit substances, including but not limited to records pertaining to the procurement of various chemical reagents, solvents, and laboratory equipment necessary for the manufacture, preparation, or

production of illicit synthetic substances. I know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances and listed chemicals. I also know that drug traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes, including communications with co-conspirators, suppliers, and purchasers.

86.     I know drug traffickers often register phones, mailboxes, bank accounts, electronic communication services, and other instrumentalities of drug trafficking in the names of others, also known as nominees, to distance themselves from instrumentalities used to facilitate drug trafficking. I also know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances.

87.     I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets in order to avoid scrutiny from law enforcement officials.

88.     I know drug traffickers often use electronic devices, such as telephones, cellular devices, computers, and currency counting machines to generate, transfer, count, record, or store the information described above and conduct drug trafficking and money laundering. I am familiar with computers, cellular devices, pagers, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their

drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

89.     I have participated in numerous drug trafficking investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. This has led to evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. I have regularly used electronic evidence to find proof relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of suspects and conspirators.

90.     Based upon the foregoing and the investigation to date, there is probable cause to believe that evidence of unlawful manufacture, preparation or production of methamphetamine and/or other illicit substances, i.e., DMT; evidence of criminal possession and/or sale of said controlled substances and listed chemicals, including but not limited to communication with co-

conspirators, and/or communication surrounding the procurement of the various chemical reagents, solvents and laboratory equipment used in furtherance of this illicit business, contact information for suppliers and/or customers, e-mails, instant messaging, social media messaging platforms, photographs or other digital images, contacts, network connections, stored passwords, file name lists, and all records in whatever form found, evincing possession, knowledge, intent, ownership and use of the items of property set forth herein will be found in the contents of the items sought to be searched as described in detail herein.

91.     Information stored within a cellular phone (cell phone) and other electronic devices may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored within a cell phone and other electronic devices can indicate who has used or controlled the cell phone or other devices.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone or devices at a relevant time.  Further, such stored electronic data can show how and when the cell phone or other electronic devices and its related account were accessed or used.  Such "timeline" information allows investigators to understand the chronological context of cell phone or other electronic device access, use, and events relating to the crime under investigation.  This "timeline" information may tend to either inculpate or exculpate the cell phone or other device account owner.  Additionally, information stored within a cell phone or other electronic device may indicate the geographic location of the cell phone or other electronic device and user at a particular time (e.g.,

location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the cell phone or other electronic device owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone or other electronic device may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone or other electronic device itself or by a program that deletes or over-writes the data contained within the cell phone or other electronic device, such data will remain stored within the cell phone or other electronic device indefinitely.

92.     Based on my training and experience, my review of the New York case file, and information received from both LESHINSKY and SIGMA-ALDRICH INC., there is probable cause to believe communications between LESHINSKY and representatives from SIGMA-ALDRICH INC. are contained within LESHINSKY's electronic devices. In addition, there is probable cause to believe that evidence of the acquisition and unlawful distribution of controlled substances and listed chemicals may likely be stored and recorded on the Devices.

93.     The Devices are currently in the lawful possession of the DEA, as they were taken during the execution of the search warrants and seized incident to arrest. Therefore, while the DEA might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

94.     The Devices are currently in storage at Drug Enforcement Administration's Milwaukee District Office. In my training and experience, I know that the Devices have been

stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the DEA.

## TECHNICAL TERMS

95. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

96. Based on my training, experience, and research, I know that some of the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

97. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

98. There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To

give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

99. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

100. *Nature of Examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

101. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

102. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

KERRIANNE SUNDBERG
Digitally signed by
KERRIANNE SUNDBERG
Date: 2025.02.11 15:41:39
-06'00'

_____

Kerrianne Sundberg
Diversion Investigator
Drug Enforcement Administration

Subscribed and sworn to before me
on February 12, 2025:

_____

UNITED STATES MAGISTRATE JUDGE



## SEARCH WARRANT

STATE OF NEW YORK)
                ) SS:
COUNTY OF SUFFOLK)

Suffolk County Court
Sitting as a Local Criminal Court
Town of Southampton

### IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK:

To any Police Officer in the State of New York or any Police Officer in the Suffolk County Police Department, or any Police Officer in the New York State Police Department or any Police Officer in the NYS Department of Environmental Conservation Police Department:

Proof, by affidavit, having been this day made before me, by Detective Jeremy Fanning, Shield No. 1569, that there is probable cause for believing that certain property:

is unlawfully possessed;
has been used to commit an offense against the laws of this state or another state;
has been used to conceal the commission of an offense against the laws of this state or another state;
is possessed for the purpose of being used to commit an offense against the laws of this state or another state;
is possessed for the purpose of being used to conceal the commission of an offense against the laws of this state or another state;
constitutes evidence that an offense was committed in this state or another state;
tends to demonstrate that an offense was committed in this state or another state;
constitutes evidence that a particular person participated in the commission of an offense in this state or another state;
tends to demonstrate that a particular person participated in the commission of an offense in this state or another state.

YOU ARE, THEREFORE, COMMANDED, at any time of day or night, to make a search of the entire premises located at 1850 Pond Road, Ronkonkoma, Town of Islip, Suffolk County, New York, a commercial standalone building/structure situated in an industrial complex. The structure/building is made up of cinderblocks painted white in color with a blue colored pattern running along the top of the structure along the west and north sides of the building. The building houses two separate businesses. Access from Pond Road is through an industrial driveway with numerous parking spots. The front entrance of the building is made up of two glass doors situated on the northeast corner of the structure and there is an exit door situated on the south side of the structure. There is a red background with white lettering sign affixed to the north side of the building stating DESIGN, PRINTING, DIRECT MAIL and FULFILLMENT.

There is a white Audi RS5 model with NY Registration Number KZN 5323 parked along the north side of the building under the aforementioned sign. The building/structure/business was occupied by a White male named Matthew Leshinsky, DOB: 9.21.99.

This warrant authorizes the search of the entire building/structure for the following property:

Controlled substances, including but not limited to Methamphetamine, materials and paraphernalia related to the manufacturing, packaging, and distribution of said substance; books and records reflecting transactions of the illicit drug business, including surveillance camera equipment, including but not limited to monitors, cameras, recording apparatus; cellular telephones, including but not limited to a gray Apple I-Phone with a blue case taken from the person of Leshinsky on 6.7.23, and the data relative to drug transactions contained therein; and items constituting indicia of knowing possession, ownership or control of the premises or of the contraband including, but not limited to, bills, receipts and other personal effects indicating such ownership, knowledge or control.

This warrant also authorizes, in carrying out the above commands, utilization or the assistance of others with expertise in decoding and/or obviating password protections and/or encryptions, and in transferring, downloading, converting, dumping or draining of data from the memories of any cellular devices, in order to minimize possible loss or alteration of such data in the course of making them legible and storable in a legible form. Such experts may be members of law enforcement organizations, industry trade associations or from companies, which manufacture, distribute or service such software or electronic devices or telecommunications industries. It is further authorized that said cellular instrument may be retained for the purposes of further analysis and examination.

This warrant additionally authorizes, in carrying out the above commands, utilization or the assistance of others with expertise in the safe handling and processing of evidence related to the manufacturing, packaging and distribution of methamphetamines, including members of the Department of Environmental Conservation's Division of Environmental Remediation.

And if you find the same or any part thereof, to bring it before me, without any necessary delay, at my office in the Town of Southampton, County of Suffolk, New York.

Dated at the said Town of Southampton, County of Suffolk, New York, the 7th day of June, 2023.

Karen M Wilutis

Hon. Karen M. Wilutis, J.C.C.
Sitting as a Local Criminal Court Judge

5 39 pm

Time Signed

SEARCH WARRANT

STATE OF NEW YORK)

               ) SS:

COUNTY OF SUFFOLK)

Suffolk County Court
Sitting as a Local Criminal Court
Town of Southampton

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK:

To any Police Officer in the State of New York or any Police Officer in the Suffolk County Police Department, or any Police Officer in the New York State Police Department or any Police Officer in the NYS Department of Environmental Conservation Police Department:

Proof, by affidavit, having been this day made before me, by Detective Jeremy Fanning, Shield No. 1569, that there is probable cause for believing that certain property:

YOU ARE, THEREFORE, COMMANDED, to make a search of the entire vehicle, including any and all component parts of a white 2023 Audi RS5, with New York Registration Number KZN5323, which according to records maintained by the NYS Department of Motor Vehicle is registered to a Matthew E. Leshinsky, DOB: 9/21/99, at 132 Sunrise Lane, Levittown, New York.

This warrant authorizes the search of the entire vehicle of a 2023 white Audi, with NY Reg. No.: KZN5323, for the following property:

Controlled substances, including but not limited to Methamphetamine, materials and paraphernalia related to the manufacturing, packaging, and distribution of said substance; books and records reflecting transactions of the illicit drug business, cellular telephones, and the data relative to drug transactions contained therein; and items constituting indicia of knowing possession, ownership or control of the premises or of the contraband including, but not limited to, bills, receipts and other personal effects indicating such ownership, knowledge or control

This warrant also authorizes, in carrying out the above commands, utilization or the assistance of others with expertise in decoding and/or obviating password protections and/or encryptions, and in transferring, downloading, converting, dumping or draining of data from the memories of any cellular devices, in order to minimize possible loss or alteration of such data in the course of making them legible and storable in a legible form. Such experts may be members of law enforcement organizations, industry trade associations or from companies, which manufacture, distribute or service such software or electronic devices or telecommunications industries. It is further authorized that said cellular instrument may be retained for the purposes of further analysis and examination.

And if you find the same or any part thereof, to bring it before me, without any necessary delay, at my office in the Town of Southampton, County of Suffolk, New York.

Dated at the said Town of Southampton, County of Suffolk, New York, the 7th day of June, 2023.

_____
Hon. Karen M. Wilutis, J.C.C.
Sitting as a Local Criminal Court Judge

_____
5-39 pm
Time Signed

SEARCH WARRANT

STATE OF NEW YORK)

                ) SS:

COUNTY OF SUFFOLK)

Suffolk County Court
Sitting as a Local Criminal Court
Town of Southampton

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK:

      To any Police Officer in the State of New York or any Police Officer in the Suffolk County Police Department, or any Police Officer in the New York State Police Department or any Police Officer in the NYS Department of Environmental Conservation Police Department:

      Proof, by affidavit, having been this day made before me, by Detective Jeremy Fanning, Shield No. 1569, that there is probable cause for believing that certain property:

      YOU ARE, THEREFORE, COMMANDED, at any time convenient to law enforcement personnel, to make a search of the displayed and stored data contained in a gray Apple I-Phone in a blue case taken from the person of Matthew Leshinsky, 9.21.99, currently in the possession of the SCPD, for the following property:

      Specifically, the data relative to the acquisition, possession and distribution of controlled substances, including methamphetamine, including the conspiracy to commit the same, including but not limited to text messaging, e-mails, instant messaging, WhatsApp and other social media messaging platforms, photographs or other digital images, stored contact lists, including phone numbers, codes, stored phone books, "buddy" lists, nicknames and addresses, internal GPS systems(s), network connections, stored passwords, file name lists, "readme" and all records in whatever form found, inclusive of any and all communications with known/unknown co-conspirators, evincing possession, knowledge, intent, ownership and use of any of the items of property set forth herein.

      This warrant also authorizes, in carrying out the above commands, utilization or the assistance of others with expertise in decoding and/or obviating password protections and/or encryptions, and in transferring, downloading, converting, dumping or draining of data from the memories of any cellular devices, in order to minimize possible loss or alteration of such data in the course of making them legible and storable in a legible form. Such experts may be members of law enforcement organizations, industry trade associations or from companies, which manufacture, distribute or service such software or electronic devices or telecommunications industries. It is further authorized that said cellular instrument may be retained for the purposes of further analysis and examination.

      And if you find the same or any part thereof, to bring it before me, without any necessary delay, at my office in the Town of Southampton, County of Suffolk, New York.

Dated at the said Town of Southampton, County of Suffolk, New York, the 7th day of June, 2023.

_Karen M Wilutis_
Hon. Karen M. Wilutis, J.C.C.
Sitting as a Local Criminal Court Judge

_5 39 pm_
Time Signed

County of Suffolk

Suffolk County Court
Sitting as a Local Criminal Court
Town of Southampton

APPLICATION AND AFFIDAVIT

FOR

SEARCH WARRANT

In the Matter of the Application of Detective Jeremy Fanning, Shield No. 1569, for a warrant authorizing the search of:

(1)  The entire premises located at 1850 Pond Road, Ronkonkoma, Town of Islip, Suffolk County, New York, a commercial standalone building/structure situated in an industrial complex. The structure/building is made up of cinderblocks painted white in color with a blue colored pattern running along the top of the structure along the west and north sides of the building. The building houses two separate businesses.  Access from Pond Road is through an industrial driveway with numerous parking spots.  The front entrance of the building is made up of two glass doors situated on the northeast corner of the structure and there is an exit door situated on the south side of the structure.  There is a red background with white lettering sign affixed to the north side of the building stating DESIGN, PRINTING, DIRECT MAIL and FULFILLMENT.  There is a white Audi RS5 model with NY Registration Number KZN 5323 parked along the north side of the building under the aforementioned sign.  The building/structure/business was occupied by a White male named Matthew Leshinsky, DOB: 9.21.99;

(2)  The entire vehicle, including any component parts of a white 2023 Audi RS5 with NY Reg. KZN5323, which according to records maintained by the NY S Department of Motor Vehicle is registered to a Matthew E. Leshinsky, DOB: 9/21/99, at 132 Sunrise Lane, Levittown, New York;

(3) the displayed and stored data contained in a gray Apple I-Phone with a blue case taken from the person of Matthew Leshinsky, 9.21.99, presently in the possession of the SCPD,

(4) for certain property which is unlawfully possessed; has been used to commit an offense against the laws of this state or another state; has been used to conceal the commission of an offense against the laws of this state or another state; is possessed for the purpose of being used to commit an offense against the laws of this state or another state; is possessed for the purpose of being used to conceal the commission of an offense against the laws of this state or another state; constitutes evidence that an offense was committed in this state or another state; tends to demonstrate that an offense was committed in this state or another state; constitutes evidence that a particular person participated in the commission of an offense in this state or another state; tends to demonstrate that a particular person participated in the commission of an offense in this state or another state; to wit:

Controlled substances, including but not limited to Methamphetamine, materials and paraphernalia related to the manufacturing, packaging, and distribution of said substance; books and records reflecting transactions of the illicit drug business, including surveillance camera equipment, including but not limited to monitors, cameras, recording apparatus; cellular telephones, including but not limited to a gray Apple I-Phone with a blue case taken from the person of Leshinsky on 6.7.23, and the data relative to drug transactions contained therein; and items constituting indicia of knowing possession, ownership or control of the premises or of the contraband including, but not limited to, bills, receipts and other personal effects indicating such ownership, knowledge or control.

STATE OF NEW YORK)
        ) SS:
COUNTY OF SUFFOLK)

Detective Jeremy Fanning, Shield No. 1569, being duly sworn, deposes and says:

(5)  I am a Detective employed by the Suffolk County Police Department.  I have been a Police Officer for approximately eighteen years and a Detective for approximately five (5) of those years. I am currently assigned to the Arson Section, prior to which I was assigned as a detective to the Narcotics Section for three (3) years.  I have participated in hundreds of investigations and arrests involving the sale and possession of narcotics and other controlled substances, including methamphetamines.  I have received additional training in the detection and investigations of various controlled substances, including methamphetamines through HIDTA (High Intensity Drug Trafficking Areas).  Based on my experience as a Police Officer, I am fully familiar with the *modus operandi* of those engaged in the manufacturing and distribution of methamphetamines and other drugs.  I am also trained in the detection and recognition of various illicit substances, including methamphetamine.

(6)  I have information based upon personal knowledge and information and belief, the sources being conversations had with fellow officers of the Suffolk County Police Department that there is probable cause to believe that unlawful controlled substances, including but not limited to Methamphetamines, and evidence related to the manufacturing and distribution of same, are present inside the commercial premises located at 1850 Pond Road, Ronkonkoma, New York.

(7)    On June 7, 2023, at approximately 03:30 Hours, SCPD Dispatch received a call about a possible burglary in progress at the location of 1850 Pond Road, Ronkonkoma, Suffolk County, New York.  As a result, SCPD Patrol Units 535 & 501 were assigned the call and responded to the location of the possible burglary in progress.  Eventually other assisting Police units arrived to help in the investigation.

Upon arrival at the location, Officers were met by the caller, Matthew Leshinsky, DOB: 9.21.99, who stated that while he was in his office at 1850 Pond Road, "working," two men broke into the building through the front glass door and that he believed the perpetrators were still inside. On that representation by Leshinsky and after confirming evidence of a forced entry, members of the SCPD's K-9 Unit were called-in to further assist in the investigation.

Upon securing the exterior of the building in order to prevent any possible perpetrators from escaping from the location and K-9 Units arrival, entry into the building was gained through the breached front door.  Moreover, upon entering the building no other individuals were located inside.  Officers did notice additional breach or attempt to breach a secured/locked interior office that contained a safe.  Officers did also observe what appeared to be burglars' tools in or around the area of this breach attempt.  Inside the secured/locked office were two blue 55-gallon plastic drums. Incidentally, Leshinsky opened the secured/locked office by placing his fingerprint on the portion of the lock and as a result the door opened.  Importantly, upon initial entry into the inside of the building at issue, SCPD Officers notices a strong chemical odor emanating throughout the interior of the building.

In an adjoining office to the secured/locked office containing the safe, Police observed surveillance equipment, including recording devices and several monitors displaying the respective camera angles in and about the building. More so, Police observed a crystalline-like type of substance on the desk and on the floor, which based upon the Officers' training and experience appeared to be methamphetamine in nature.

Next, off of the office/room housing the surveillance equipment, Police observed various chemical containers scattered throughout that room/office. Some of the chemicals included large glass bottles of Acetone, Naphtha, baking soda and other chemical solvents, which on the basis of your deponent's experience and based upon conversations with other members of the law enforcement community, are used in the manufacturing of methamphetamine, often times referred to as methamphetamine precursors. Also, scattered in this portion of the interior of the building were various laboratory equipment, such as beakers, syringes, a water pipe and a hand held torch.

Finally, an examination of the warehouse portion of the building revealed numerous large unlabeled blue plastic drums, chemical containers and a chemical apparatus that was operational. On the basis of these factors, and based on your deponent's training and experience, the hardware and chemical substances observed inside the building at issue are consistent with those used in the manufacturing of methamphetamine. Thus, there is probable cause to believe that controlled substances including but not limited to Methamphetamine, and evidence related to the manufacturing, packaging and distribution of same, will be found at the above described premises.

(8) Furthermore, on the basis of plain view observation of the contents inside the target vehicle, namely, Audi RS5 with NYR: KZN5323, SCPD observed a recent bank withdrawal receipt from Chase Bank indicating a withdrawal in the amount of over $101,000.00. Additionally, on the basis of your deponent's training and experience, those involved in the manufacturing and distribution of methamphetamines and other illicit substances will utilize a method of transport to procure the precursors and other material as well as to transport the final manufactured product to their distribution network(s).

(9) Further, there is probable cause to believe that U.S. Currency as proceeds of illicit enterprise will be found therein. In your deponent's experience and training, an illicit enterprise such as this is conducted on a cash basis. Cash is received as payment for substances sold and it is also the method used by the seller to repay his/her supplier, or for manufacturers to purchase the precursors and equipment needed in the manufacturing of methamphetamine. In fact, in the instant matter, the only other point of breach inside the building appeared to be the secured/locked office containing a safe. On the basis of your deponent's training and experience, those involved in the manufacturing, packaging and distribution of methamphetamines, will keep the proceeds of their illicit business inside of safes, as well as any weapons to protect their product and any proceeds of same. Hence, there is probable cause to believe that cash is being stored at the above described premises and or inside the safe.

(10) In your deponent's experience and training, books and records are also maintained by illicit manufacturers and sellers of methamphetamines which reflect not only transactions made by the seller to purchasers but also to record transactions between the seller and his supplier(s) or to

account for the chemicals and hardware needed in the manufacturing of same. Hence, there is probable cause to believe that books and records relative to these illicit manufacturing and/or sales are being kept at the above described premises.

In your deponent's experience and training, illicit dealers of controlled substances commonly utilize cellular telephones to conduct their business, as the nature of their business often requires travel to procure and/or sell their product. Said instruments, by their nature, frequently have stored contact numbers, call histories, pictures, historical text messages, and other data evidencing their illicit business. Dealers and or manufacturers also often maintain multiple cellular telephones as a means by which to segregate certain aspects of their activities, and to also allow business to continue on effectively, should the need arise to terminate a number in an effort to avoid detection by law enforcement. In fact, in the instance case a gray Apple I-Phone in a blue case was taken from Leshinsky, who was actively utilizing it at the time of this investigation. As such, there is probable cause to believe said instruments, in addition to the instrument previously cited and identified, will be found, and furthermore that they will contain evidence related to the sale of controlled substances.

It is also requested that this Court authorize the utilization of persons with expertise, whether members of law enforcement or industry representatives who are requested by your affiant, to assist if necessary in the decoding of protective passwords, the downloading, dumping or draining of data from the aforesaid cellular telephones. Such authorization will not only in some cases make access to such records possible, but will also minimize the risk of loss or alteration of any such data.

(11)    In addition, authorization to search for and seize all personal items indicating knowing possession, control or ownership of the premises and of the contraband is requested. These items include, but are not limited to, bills, receipts and other personal effects establishing such ownership, knowledge or control.

Members of the Suffolk County Police Department have presently secured the premises in question. As previously mentioned, your deponent is aware that laboratories and the constituent materials they maintain are often dangerous and volatile substances that require care in handling. As such, your deponent asks for permission to execute this warrant immediately, at any time of day or night, and importantly, your deponent requests the utilization of members of the NYS DEC's Division of Environmental Remediation in order to ensure safe handling and processing of any hazardous material.

(12) Based upon the foregoing reliable information and upon my personal knowledge, there is probable cause to believe that such property, to wit: Controlled substances, including but not limited to Methamphetamine, materials and paraphernalia related to the manufacturing, packaging, and distribution of said substance; books and records reflecting transactions of the illicit drug business, including surveillance camera equipment, including but not limited to monitors, cameras, recording apparatus; cellular telephones, including but not limited to a gray Apple I-Phone with a blue case taken from the person of Leshinsky on 6.7.23, and the data relative to drug transactions contained therein; and items constituting indicia of knowing possession, ownership or control of the premises or of the contraband including, but not limited to, bills, receipts and other personal effects

indicating such ownership, knowledge or control;

is unlawfully possessed;

has been used to commit an offense against the laws of this state or another state;

has been used to conceal the commission of an offense against the laws of this state or another state;

is possessed for the purpose of being used to commit an offense against the laws of this state or another state;

is possessed for the purpose of being used to conceal the commission of an offense against the laws of this state or another state;

constitutes evidence that an offense was committed in this state or another state;

tends to demonstrate that an offense was committed in this state or another state;

constitutes evidence that a particular person participated in the commission of an offense in this state or another state;

tends to demonstrate that a particular person participated in the commission of an offense in this state or another state.

and may be found

(13) within the premises located at 1850 Pond Road, Ronkonkoma, Town of Islip, Suffolk County, New York, as previously described herein; and/or

Within the vehicle of a 2023 white Audi RS5 with NYR: KZN5323, as previously describe herein; and/or

Contained in the displayed and stored data of a gray Apple I-Phone with a blue case taken from the person of Matthew Leshinsky, 9.21.99, presently in the possession of the SCPD.

WHEREFORE, I respectfully request that the court issue a warrant and order of seizure, in the form annexed, authorizing the search of said premises and cellular instrument,

And directing that if such property or evidence or any part thereof be found, that it be seized and brought before the court; together with such other and further relief that the court may deem proper.

No other application in this matter has been made in this or any other court or to any other judge, justice or magistrate.

Detective Jeremy Fanning, Shield No. 1569

Sworn to before me, this
7th day of June, 2023.

Hon. Karen M. Wilutis, J.C.C.
Sitting as a Local Criminal Court Judge



**EXHIBIT**

**B**

## SEARCH WARRANT

STATE OF NEW YORK)

               ) SS:

COUNTY OF SUFFOLK)

Suffolk County Court
Sitting as a Local Criminal Court
Town of Southampton

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK:

       To any Police Officer in the State of New York or any Police Officer in the Suffolk County Police Department, or any Police Officer in the New York State Police Department or any Police Officer in the NYS Department of Environmental Conservation Police Department:

       Proof, by affidavit, having been this day made before me, by Detective Jeremy Fanning, Shield No. 1569, that there is probable cause for believing that certain property:

is unlawfully possessed;

has been used to commit an offense against the laws of this state or another state;

has been used to conceal the commission of an offense against the laws of this state or another state;

is possessed for the purpose of being used to commit an offense against the laws of this state or another state;

is possessed for the purpose of being used to conceal the commission of an offense against the laws of this state or another state;

constitutes evidence that an offense was committed in this state or another state;

tends to demonstrate that an offense was committed in this state or another state;

constitutes evidence that a particular person participated in the commission of an offense in this state or another state;

tends to demonstrate that a particular person participated in the commission of an offense in this state or another state.

       YOU ARE, THEREFORE, COMMANDED, between the hours of 6AM and 9PM, to make a search of the main level portion of the premises and any common areas accessible therefrom including the attached one-car garage, located at 19 Tulip Avenue, Farmingville, Town of Brookhaven, Suffolk County, New York, a ranch-style residence.  19 Tulip is situated on the north side of Tulip Avenue facing a southerly direction.  The exterior of the residence is made up of gray vinyl siding with white window trimming and red shutters and a dark colored shingled roof, with solar panels.  There is a blacktop driveway situated on the eastern portion of the property leading to an attached one-car garage.  To the west of the driveway at the apron is a Rubbermaid gray mailbox with number "19" affixed to the east side of said mailbox. There is a main entrance door and storm door which are accessible from a four step stoop with white vinyl

railing. There is an additional set of stairs situated to the west of the front entrance leading to an accessory basement apartment. The residence is occupied by a White male named Matthew Leshinsky, DOB: 9.21.99, a white female named Jennifer DeCola, DOB: 3.17.82, and other unknown persons.

This warrant authorizes the search of the main level of the residence and any common areas accessible therefrom, including the attached one-car garage/the entire premises for the following property:

Controlled substances, including but not limited to Methamphetamine, materials and paraphernalia related to the manufacturing, packaging, and distribution of said substance; books and records reflecting transactions of the illicit drug business, in either digital or document forms, including any computing systems, surveillance camera equipment (i.e., Ring Camera systems), including but not limited to monitors, cameras, recording apparatus; cellular telephones, laptops, computers, tablets and the data relative to illicit drug business activities; and items constituting indicia of knowing possession, ownership or control of the premises or of the contraband including, but not limited to, bills, receipts and other personal effects indicating such ownership, knowledge or control.

This warrant also authorizes, in carrying out the above commands, utilization or the assistance of others with expertise in decoding and/or obviating password protections and/or encryptions, and in transferring, downloading, converting, dumping or draining of data from the memories of any cellular devices, in order to minimize possible loss or alteration of such data in the course of making them legible and storable in a legible form. Such experts may be members of law enforcement organizations, industry trade associations or from companies, which manufacture, distribute or service such software or electronic devices or telecommunications industries. It is further authorized that said cellular instrument may be retained for the purposes of further analysis and examination.

And if you find the same or any part thereof, to bring it before me, without any necessary delay, at my office in the Town of Southampton, County of Suffolk, New York.

Dated at the said Town of Southampton, County of Suffolk, New York, the 8th day of June, 2023.

_____
Hon. Karen M. Wilutis, J.C.C.
Sitting as a Local Criminal Court Judge

_____5-41 pm_____
Time Signed

County of Suffolk

Suffolk County Court
Sitting as a Local Criminal Court
Town of Southampton

APPLICATION AND AFFIDAVIT

FOR

SEARCH WARRANT

In the Matter of the Application of Detective Jeremy Fanning, Shield No. 1569, for a warrant authorizing the search of:

(1)   The main level portion of the premises and any common areas accessible therefrom including the attached one-car garage, located at 19 Tulip Avenue, Farmingville, Town of Brookhaven, Suffolk County, New York, a ranch-style residence. 19 Tulip is situated on the north side of Tulip Avenue facing a southerly direction. The exterior of the residence is made up of gray vinyl siding with white window trimming and red shutters and a dark colored shingled roof, with solar panels. There is a blacktop driveway situated on the eastern portion of the property leading to an attached one-car garage. To the west of the driveway at the apron is a Rubbermaid gray mailbox with number "19" affixed to the east side of said mailbox. There is a main entrance door and storm door which are accessible from a four step stoop with white vinyl railing. There is an additional set of stairs situated to the west of the front entrance leading to an accessory basement apartment. The residence is occupied by a White male named Matthew Leshinsky, DOB: 9.21.99, a white female named Jennifer DeCola, DOB: 3.17.82, and other unknown persons;

(2)   The entire vehicle, including any component parts of a black 2019 Lexus RC350 with NY Reg. KUP1040, which according to records maintained by the NYS Department of Motor Vehicle is registered to a Craig Leshinsky, DOB: 12/23/64, at 132 Sunrise Avenue,

Levittown, New York,

(3) for certain property which is unlawfully possessed; has been used to commit an offense against the laws of this state or another state; has been used to conceal the commission of an offense against the laws of this state or another state; is possessed for the purpose of being used to commit an offense against the laws of this state or another state; is possessed for the purpose of being used to conceal the commission of an offense against the laws of this state or another state; constitutes evidence that an offense was committed in this state or another state; tends to demonstrate that an offense was committed in this state or another state; constitutes evidence that a particular person participated in the commission of an offense in this state or another state; tends to demonstrate that a particular person participated in the commission of an offense in this state or another state; to wit:

Controlled substances, including but not limited to Methamphetamine, materials and paraphernalia related to the manufacturing, packaging, and distribution of said substance; books and records reflecting transactions of the illicit drug business, in either digital or document forms, including any computing systems, surveillance camera equipment (i.e., Ring Camera systems), including but not limited to monitors, cameras, recording apparatus; cellular telephones, laptops, computers, tablets and the data relative to illicit drug business activities; and items constituting indicia of knowing possession, ownership or control of the premises or of the contraband including, but not limited to, bills, receipts and other personal effects indicating such ownership, knowledge or control.

STATE OF NEW YORK)
　　　　) SS:
COUNTY OF SUFFOLK)

Detective Jeremy Fanning, Shield No. 1569, being duly sworn, deposes and says:

(5)  I am a Detective employed by the Suffolk County Police Department.  I have been a Police Officer for approximately eighteen years and a Detective for approximately five (5) of those years. I am currently assigned to the Arson Section, prior to which I was assigned as a detective to the Narcotics Section for three (3) years.  I have participated in hundreds of investigations and arrests involving the sale and possession of narcotics and other controlled substances, including methamphetamines.  I have received additional training in the detection and investigations of various controlled substances, including methamphetamines through HIDTA (High Intensity Drug Trafficking Areas).  Based on my experience as a Police Officer, I am fully familiar with the *modus operandi* of those engaged in the manufacturing and distribution of methamphetamines and other drugs.  I am also trained in the detection and recognition of various illicit substances, including methamphetamine.

(6)  I have information based upon personal knowledge and information and belief, the sources being conversations had with fellow officers of the Suffolk County Police Department that there is probable cause to believe that books and records, in either digital format or actual paper documentation form, items for the manufacturing, packaging and weighing of controlled substances, including but not limited to methamphetamines, proceeds of the illicit drug business, including U.S. currency, and evidence related to the manufacturing and distribution of same, are present inside the residence located at 19 Tulip Avenue, Farmingville, NY, and/or within the vehicle of a 2019 black Lexus with NYR: KUP1040

This Application is also based upon the information detailed in a Search Warrant issued by the Hon. Karen M. Wilutis, J.C.C., Acting as a Local Criminal Court, on June 7, 2023.  Your deponent asks that the Search Warrant issued on June 7, 2023, under CC#: 23-389543, be incorporated by reference herein as if it was recited in its entirety.  A copy of the June 7, 2023, Warrant is annexed hereto as Exhibit "1."

(7)　　As a result of the Search Warrant issued on June 7, 2023, law enforcement recovered approximately 91 grams of solid Methamphetamine, liquid Methamphetamine in far excess of two (2) ounces, a substance containing Cocaine in excess of eight (8) ounces.  The substance containing the cocaine was found inside of a safe with roughly $40,000.  Additionally, throughout the entire commercial facility, law enforcement recovered numerous laboratory instruments and equipment, precursors and other chemicals, all used in the manufacturing of Methamphetamines.  In addition, Police recovered numerous glass bottles containing the controlled substance Dimethyltryptamine ("DMT"), numerous blue 55 gallon drums containing Gamma-butyrolactone ("GBL").  All of this recovered from the location of 1850 Pond Road, Ronkonkoma, NY.

Consequently, a Matthew Leshinsky, 9/21/99, was arrested and charged with Criminal Possession of a Controlled Substance ("CPCS") 1st under PL §220.21(1), as a class AI felony, CPCS 2nd under PL §220.18(2), as a class AII felony, and five (5) counts of CPCS 3rd in violation

of PL §§220.16(1), (6), (7) & (11), and Unlawful Manufacturing Methamphetamine in the Third Degree in violation of PL §220.73(1). Currently, Leshinsky is awaiting arraignment in Suffolk County District Court for said charges.

As a result of examination of Leshinsky's criminal history, your deponent learned that he is currently under the supervision of the Nassau County Department of Probation for his conviction on July 7, 2021, in said County for the crime of Endangering the Welfare of a Child in violation of PL §260.10(1), wherein he received a probationary sentence not to exceed three (3) years. As a result of inquiry into his probationary sentence, it was learned that he resides at 19 Tulip Avenue, Farmingville. Suffolk County. In addition, the black Lexus referenced herein is currently parked in the driveway of 19 Tulip Avenue, Farmingville. Moreover, the purported owner of the residence, Jennifer DiCola indicates that Leshinsky does maintain a residence at this location since the winter of 2022/2023.

(8)    On the basis of all factors articulated herein as well as the facts and circumstances delineated in the warrant incorporated by referenced herein, there is probable cause to believe that books and records, in digital or document forms, will be found within the described residence. In your deponent's experience and training, books and records are also maintained by illicit manufacturers and sellers of methamphetamines which reflect not only transactions made by the seller to purchasers but also to record transactions between the seller and his supplier(s) or to account for the chemicals and hardware needed in the manufacturing of same. Hence, there is probable cause to believe that books and records relative to these illicit manufacturing and/or sales are being kept at the above described premises

(9)    Further, there is probable cause to believe that U.S. Currency as proceeds of illicit enterprise will be found therein. In your deponent's experience and training, an illicit enterprise such as this is conducted on a cash basis. Cash is received as payment for substances sold and it is also the method used by the seller to repay his/her supplier, or for manufacturers to purchase the precursors and equipment needed in the manufacturing of methamphetamine. Hence, there is probable cause to believe that cash is being stored at the above described premises and or inside the safe.

(10)    In your deponent's experience and training, illicit dealers of controlled substances commonly utilize cellular telephones to conduct their business, as the nature of their business often requires travel to procure and/or sell their product. Said instruments, by their nature, frequently have stored contact numbers, call histories, pictures, historical text messages, and other data evidencing their illicit business. Dealers and or manufacturers also often maintain multiple cellular telephones as a means by which to segregate certain aspects of their activities, and to also allow business to continue on effectively, should the need arise to terminate a number in an effort to avoid detection by law enforcement. In fact, in the instance case a gray Apple I-Phone in a blue case was taken from Leshinsky, who was actively utilizing it at the time of this investigation. As such, there is probable cause to believe said instruments, in addition to the instrument previously cited and identified, will be found, and furthermore that they will contain evidence related to the sale of controlled substances.

It is also requested that this Court authorize the utilization of persons with expertise, whether members of law enforcement or industry representatives who are requested by your affiant,

to assist if necessary in the decoding of protective passwords, the downloading, dumping or draining of data from the aforesaid cellular telephones. Such authorization will not only in some cases make access to such records possible, but will also minimize the risk of loss or alteration of any such data.

(11)    In addition, authorization to search for and seize all personal items indicating knowing possession, control or ownership of the premises and of the contraband is requested. These items include, but are not limited to, bills, receipts and other personal effects establishing such ownership, knowledge or control.

(12)    Based upon the foregoing reliable information and upon my personal knowledge, there is probable cause to believe that such property, to wit: Controlled substances, including but not limited to Methamphetamine, materials and paraphernalia related to the manufacturing, packaging, and distribution of said substance;  books and records reflecting transactions of the illicit drug business, in either digital or document forms,  including any computing systems, surveillance camera equipment (i.e., Ring Camera systems), including but not limited to monitors, cameras, recording apparatus; cellular telephones, laptops, computers, tablets and the data relative to illicit drug business activities; and items constituting indicia of knowing possession, ownership or control of the premises and or of the contraband including, but not limited to, bills, receipts and other personal effects indicating such ownership, knowledge or control;

is unlawfully possessed;
has been used to commit an offense against the laws of this state or another state;
has been used to conceal the commission of an offense against the laws of this state or another state;
is possessed for the purpose of being used to commit an offense against the laws of this state or another state;
is possessed for the purpose of being used to conceal the commission of an offense against the laws of this state or another state;
constitutes evidence that an offense was committed in this state or another state;
tends to demonstrate that an offense was committed in this state or another state;
constitutes evidence that a particular person participated in the commission of an offense in this state or another state;
tends to demonstrate that a particular person participated in the commission of an offense in this state or another state.

and may be found

(13)  within the premises located at 19 Tulip Avenue, Farmingville, Town of Brookhaven, Suffolk County, New York, as previously described herein; ~~and/or~~  *KfW*

~~Within the vehicle of a 2019 black Lexus RC350 with NYR: KUP1040, as previously describe herein.~~

WHEREFORE, I respectfully request that the court issue a warrant and order of seizure, in the form annexed, authorizing the search of said premises and cellular instrument,

And directing that if such property or evidence or any part thereof be found, that it be seized and brought before the court; together with such other and further relief that the court may deem proper.

No other application in this matter has been made in this or any other court or to any other judge, justice or magistrate.

Detective Jeremy Fanning, Shield No. 1569

Sworn to before me, this
8th day of June, 2023.

Hon. Karen M. Wilutis, J.C.C.
Sitting as a Local Criminal Court Judge

## ATTACHMENT A

The property to be searched is the following (hereinafter the "Devices"):

   a. An Apple Mac Studio, Model No. A2615, Serial Number [S/N] QX34917NPW;

   b. an Apple MacBook Pro, Model No. A2141, S/N CO2D84SFMD6R;

   c. an Apple MacBook Pro, Model No. A2780, S/N KDOW9P9PF;

   d. Hewlett Packard (HP) Z2 Small Form Factor G5 Workstation tower, S/N MXL14320DB;

   e. a Dell Tower Computer, S/N CKB75R3;

   f. a Dell Tower Computer w/ Zebra Label-maker Attachment, S/N 8265NGW;

   g. a Dell Tower Computer, S/N 227951983;

   h. a Kanguru Thumb Drive, S/N 00109459;

   i. an Apple iPhone bearing DEA Self Sticking Evidence Envelope M000622531;

   j. an Apple iPad Pro, Model A2764, S/N C4TGJJ344Y;

   k. an Apple iPad Pro, Model A2379, S/N K3MG06KL7M;

   l. a Dell Precision Workstation, Model 7760, S/N GVTJPA00;

   m. an Apple MacBook Pro, Model A2485, S/N CH4L5C4H2G; and

   n. an Agilent Thumb Drive, S/N G333610002.

The Devices are currently located at the Drug Enforcement Administration's Milwaukee District Office, located at 4725 West Electric Avenue, West Milwaukee, WI 53219.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1), 830(b)(1)(A), 842(a)(5), 842(a)(9), 842(a)(10), 842(a)(11), 843(a)(3), 843(a)(6)-(7), 843(b), and 846, involving Matthew LESHINSKY, SIGMA-ALDRICH, INC., or SIGMA ALDRICH since January 1, 2019 including:

     a.   Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;

     b.   All voicemail and call records;

     c.   All text messages and call history;

     d.   Contact list, to include names, addresses, phone numbers, and/or email addresses;

     e.   All social media sites used and applications for social media sites;

     f.   Evidence about the object, scope, and overt acts in furtherance of a conspiracy;

     g.   Evidence of communications and relationships with Nikki VINOKUR, Christian BURGBACHER, and Charles GORANITIS;

     h.   Evidence of listed chemicals, precursors, reagents, solvents, or other related information, including the sourcing and supply of those materials;

     i.   Evidence of communications and relationship with employees and contractors of SIGMA-ALDRICH INC. and SIGMA-ALDRICH;

     j.   Evidence about SIGMA-ALDRICH INC. and SIGMA-ALDRICH's knowledge of the relevant reporting and recordkeeping responsibilities;

     k.   Evidence of SIGMA-ALDRICH INC. and SIGMA-ALDRICH's knowledge or reckless disregard of any suspicious transactions involving listed chemicals or items on the Special Surveillance List;

     l.   Types, amounts, and prices of controlled substance, listed chemical and laboratory equipment transactions as well as dates, places, and amounts of specific transactions;

     m.   Any information related to sources of controlled substances and/or listed chemicals and laboratory equipment (including names, addresses, phone numbers, or any other identifying information); and,

     n.   All bank records, checks, credit card bills, account information, and other financial records.

o. Evidence of compensation, gifts and/or favors exchanged between Matthew LESHINSKY and employees of SIGMA-ALDRICH, INC. or SIGMA-ALDRICH;

p. All internet activity;

q. All location data including from the phone and/or from any downloaded applications;

r. lists of customers and related identifying information;

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Devices a-n currently located at the Drug<br>Enforcement Administration's Milwaukee<br>District Office | )<br>)<br>)<br>)<br>)<br>)    Case No. 25-816M(NJ |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 2/26/2025_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Nancy Joseph, U.S. Magistrate Judge_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: 2/12/2025 @ 2:33p.m._____

_____
*Judge's signature*

City and state:   Milwaukee, Wisconsin_____

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

The property to be searched is the following (hereinafter the "Devices"):

a. An Apple Mac Studio, Model No. A2615, Serial Number [S/N] QX34917NPW;

b. an Apple MacBook Pro, Model No. A2141, S/N CO2D84SFMD6R;

c. an Apple MacBook Pro, Model No. A2780, S/N KDOW9P9PF;

d. Hewlett Packard (HP) Z2 Small Form Factor G5 Workstation tower, S/N MXL14320DB;

e. a Dell Tower Computer, S/N CKB75R3;

f. a Dell Tower Computer w/ Zebra Label-maker Attachment, S/N 8265NGW;

g. a Dell Tower Computer, S/N 227951983;

h. a Kanguru Thumb Drive, S/N 00109459;

i. an Apple iPhone bearing DEA Self Sticking Evidence Envelope M000622531;

j. an Apple iPad Pro, Model A2764, S/N C4TGJJ344Y;

k. an Apple iPad Pro, Model A2379, S/N K3MG06KL7M;

l. a Dell Precision Workstation, Model 7760, S/N GVTJPA00;

m. an Apple MacBook Pro, Model A2485, S/N CH4L5C4H2G; and

n. an Agilent Thumb Drive, S/N G333610002.

The Devices are currently located at the Drug Enforcement Administration's Milwaukee District Office, located at 4725 West Electric Avenue, West Milwaukee, WI 53219.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.     All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1), 830(b)(1)(A), 842(a)(5), 842(a)(9), 842(a)(10), 842(a)(11), 843(a)(3), 843(a)(6)-(7), 843(b), and 846, involving Matthew LESHINSKY, SIGMA-ALDRICH, INC., or SIGMA ALDRICH since January 1, 2019 including:

     a.    Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;

     b.    All voicemail and call records;

     c.    All text messages and call history;

     d.    Contact list, to include names, addresses, phone numbers, and/or email addresses;

     e.    All social media sites used and applications for social media sites;

     f.    Evidence about the object, scope, and overt acts in furtherance of a conspiracy;

     g.    Evidence of communications and relationships with Nikki VINOKUR, Christian BURGBACHER, and Charles GORANITIS;

     h.    Evidence of listed chemicals, precursors, reagents, solvents, or other related information, including the sourcing and supply of those materials;

     i.    Evidence of communications and relationship with employees and contractors of SIGMA-ALDRICH INC. and SIGMA-ALDRICH;

     j.    Evidence about SIGMA-ALDRICH INC. and SIGMA-ALDRICH's knowledge of the relevant reporting and recordkeeping responsibilities;

     k.    Evidence of SIGMA-ALDRICH INC. and SIGMA-ALDRICH's knowledge or reckless disregard of any suspicious transactions involving listed chemicals or items on the Special Surveillance List;

     l.    Types, amounts, and prices of controlled substance, listed chemical and laboratory equipment transactions as well as dates, places, and amounts of specific transactions;

     m.    Any information related to sources of controlled substances and/or listed chemicals and laboratory equipment (including names, addresses, phone numbers, or any other identifying information); and,

     n.    All bank records, checks, credit card bills, account information, and other financial records.

o.  Evidence of compensation, gifts and/or favors exchanged between Matthew LESHINSKY and employees of SIGMA-ALDRICH, INC. or SIGMA-ALDRICH;

p.  All internet activity;

q.  All location data including from the phone and/or from any downloaded applications;

r.  lists of customers and related identifying information;

2.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.  Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a.  records of Internet Protocol addresses used;

b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.